DeRette. Thank you, Your Honor. May it please the Court. My name is Sarah Lane DeRette, and along with Gary Spencer, I represent Mr. Archie in this case. Mr. Archie should not have been convicted in connection with the scheme to defraud wireless carriers or cell phone insurance companies. The suggestion that Mr. Archie could be guilty of joining the scheme, while at the same time avoiding learning the purpose or object of the scheme, should not be sanctioned by this Court. As to this fraud, the government proved at most a general knowledge about so-called credit mulling, and it showed that some of the defendants, particularly Mr. Patel, were actively involved in such fraud. It did not show that Mr. Archie knowingly participated in the scheme. As the Fifth Circuit has explained in Fuchs, the government may not prove up a conspiracy merely by presenting evidence placing the defendant in a climate of activity that reeks of something foul. And as this Court held in Jenkins, we cannot assume guilt solely through the close association of the parties. But wasn't there testimony from at least some of the alleged co-conspirators about some of the very specific discussions they had with Mr. Archie? There were, Your Honor, and I'll point the Court to two of those co-conspirators. The first one I'll call Hendy. He had a long last name, but his first name was Hendy. And he testified, and he was asked, did Mr. Archie recruit people? And he testified, yes. And when they followed up on that to say, what does that mean? He said, Mr. Archie would say things like, if you know anybody who wants to sell phones, bring them here and I'll give them my business card. There was no evidence that he was recruiting people or encouraging them to commit credit fraud or credit mulling. When they asked Mr. Hendy, did Mr. Archie ever ask you about the phones or where you got the phones? He said, no, he did not, and I didn't tell him where I got the phones. Another co-conspirator, Mr. Patel, testified. He testified that he was in a conspiracy with another person named Chris Overstreet and that they worked together to do credit mulling. So he would send Mr. Overstreet into the stores to get the credit, get the phones on credit and break those contracts. What about co-conspirator Floreal and his testimony that he trained a defendant in this fraud? That's right. Well, Your Honor, he testified that he trained a defendant in how to operate the cell phone store and how to buy and purchase cell phones and that when he initially started, Mr. Floreal, that he encouraged people to commit credit mulling, but he only did that for a limited time before he met Mr. Archie. And then after consulting with lawyers, he learned that he should not be involved in the credit mulling or encouraging people to credit mulling, and he testified that they specifically discouraged employees from doing that type of thing. So the problem in this case is the government's— and figured out how they could go back into business and protect themselves by being ignorant of where the cell phones came from. Well, Your Honor, he testified that they both went back into the business of buying cell phones and that he understood that if he wasn't involved in the credit mulling, that he wouldn't be in the conspiracy, Your Honor. And I understand that the inference the court wants to make is that then they went in and said, we're going to participate in this credit mulling, but we're going to act like we don't know about it. The problem is the intent that is charged here by the government in this case is the intent to commit the fraud on the wireless carriers. So there's no evidence that Mr. Archie agreed to join into that scheme to commit fraud on the wireless carriers. Now, the cases that the government has cited about if you're a repeat purchaser of goods, then it must show that you intend to join in the scheme. All of those cases are about the intent to possess or be in receipt of stolen property or drugs. The issue here is the government's trying to stretch that out to say if you repeatedly buy stolen property, we can extend that to say you must have the intent to commit the fraud that is what achieved that property. What about it if it's obvious to you that the property is stolen? Well, Your Honor, I think the problem here is the government decided to charge this as a fraud case, not as a receipt of stolen property case. And I agree that there may have been some stuff going on at these businesses where people should have known the property was obtained through fraud or stolen property. But the idea that just knowing that means that you have the intent to commit fraud to get those phones. It seems to me it is. I mean, you know you're receiving stolen property. And notwithstanding knowing that, you continue to pay Patel and Turt, I can't pronounce his name, and Capote, and you continue to pay them to bring you what are obviously brand new cell phones. Right, Your Honor. And there was testimony from Sprint that some of the phones that showed up at Westside Wireless or Ace Wholesale were phones that they thought had never even left their warehouse, which shows that they were stolen phones. And so the problem here is the government has said the only thing we've charged is your intent to commit fraud on these carriers. And so the fact that you received phones in your store has to show that you joined in the conspiracy to commit that fraud. And I think it's stretching the evidence in this case too far. Even the co-defendants, when they were asked about this, Mr. Patel was asked, did you discuss pricing with Mr. Archie? And he said, yes, I discussed general pricing with Mr. Archie. And then he said, quote, but there was nothing you know where I was told to go get phones. Tony never asked me to get stolen phones or fraudulent phones. And that's at page 187, I'm sorry, 177 and 186 of his testimony. So the two strongest people who were supposed to be able to show that Mr. Archie was involved in this scheme to defraud, they didn't testify that he was knowingly participating in the scheme. They testified that he didn't ask about it and that they didn't talk about it. You seem to be suggesting maybe that direct evidence is necessary to support the conspiracy conviction. And if that's your suggestion, I'm not sure that you're correct. And I don't suggest that, Your Honor. I understand that the jury was instructed in this case on deliberate ignorance or deliberate indifference. But I think the problem is that we're conflating the knowledge of joining into the scheme, the scheme to defraud, and the knowledge of what the object of the conspiracy was. Well, you infer the object when it goes on so long in such great quantities. You start drawing an inference. But, Your Honor. If it had just been one occasion or two occasions, that's nothing. Well, I think the question, then, is the court relying on direct knowledge or actual knowledge or deliberate indifference? And as the Second Circuit has talked about in several cases, how can we say that a person is deliberately trying— What was the extent of the overall volume of phones? It was a large amount of phones, Your Honor. Millions of dollars in phones. Millions of dollars. Hundreds of thousands of phones, I suppose. Right, Your Honor. And I would suggest that the government may be able to say that we can prove his agreement to traffic in stolen property. Just like co-conspirator Jason Florella, he pleaded guilty to interstate transport of stolen or fraudulently obtained property. He did not plead guilty to conspiracy to commit fraud on these wireless carriers. And I think the reason for that is it's a bridge too far in this case. The idea is if there's repeated volume, yeah, you can show maybe this person knew he was trafficking in these stolen items or fraudulent items. But the idea to say we can then extend that out and say, nope, he must have meant to achieve the fraud on the wireless carriers, I think pushes it— That isn't whether it was an objective. Whether they could achieve it or not is irrelevant. The question is what did they agree to do? That's right, Your Honor. And the question isn't whether they agreed to traffic in stolen or fraudulently obtained items. But that's what the government chose. The government chose to charge it as a fraud conspiracy. They chose to present the witnesses that they did that said, we never talked about this with Tony. He never asked us to bring fraudulent phones. He never asked us to bring stolen phones. And so I think the problem is the government chose to plead it one way. They've now conceded that this is so-called a fencing case where he was buying and selling the stolen property. But there's no evidence that he had the actual intent to join a conspiracy specifically to defraud the carriers. I recall some evidence to the effect that Fleurieu taught Defendant how to get telephones from the wireless carriers and that you could get a number if you sought to get them for a family and a corporation could get even more. You could get up to five for a family or something like that and a corporation could get even more. Doesn't that tie in his knowledge with the wireless carriers who were to be defrauded about this? May I answer your question, Your Honor? I think it does show that he understood that there was this general scheme to commit credit mulling or that it existed in the world. But there's no evidence in this case that he participated in it. The cases cited by the government, when you're talking about Naranjo or Navarro or Des, that the government cites, those people actively participated in the deceit or the misrepresentations. You say some rebuttal. Thank you, Your Honor. Bouchard. Good morning and may it please the Court. Samir Khashel for the United States. Your Honors, I think that this case and the arguments that have been raised here today show that there's only one issue that defense is challenging, which is whether this defendant knew that he was involved in a scheme to defraud. Well, I think that's true for our oral argument purposes, but every issue in the brief is preserved. That's correct, Your Honor, and if Your Honor has questions about other issues, I'm happy to address those. If you would like to ask questions about those other matters. No, no, no. Here today, the issue that's been raised is that knowledge question. And the evidence that was presented at trial was substantial, and I think that the portrayal of the evidence here has not been complete. We have to start with, first of all, that the defendant testified. Well, taking one step back, the premise that circumstantial evidence is crucial for showing knowledge is one that the Eleventh Circuit has abided by for a long period of time. It's hard to find direct evidence of knowledge because it's hard to see what's inside someone's mind. So circumstantial evidence is what juries typically look at and what the government usually presents as evidence to show intent and knowledge. And in this case, this defendant, Tony Archie, he testified, and that testimony went very poorly for him, and the jury did not believe his testimony. And during that testimony, the defendant repeatedly professed to a lack of knowledge, and that was disbelieved. And in the transcript at document 83 on page 115, 123, 157, 194, 199, 231, page after page of the transcripts, you will see instances where the defendant says things like, on page 87, he says, I never ever thought the phones were stolen. The jury did not believe that because they convicted him for obtaining stolen phones. The defendant said, well, that's not what they convicted him of. That wasn't the charge, right? The charge is not receipt of stolen property. The stolen property is part of the intrinsic fraud, but that's not the charge. The charge is a conspiracy to commit a certain type of fraud. That's correct, Your Honor, and the conspiracy charge discusses obtaining through wire fraud stolen and fraudulently obtained phones. And while perhaps there's some – there could be some wiggle room there, but there are some other instances where the defendant says that, for example, he says in response to the question, did you buy any phones that you believe are new to be procured by any sort of fraud? This is on page 129 of document 183 during his testimony. He says, no, sir, and that also was disbelieved by the jury because they convicted him. And to take one step back, Your Honor, to that question of stolen property versus wire fraud and wire fraud conspiracy, defense counsel has suggested that the government somehow made a mistake by not charging a stolen property charge here, and that is not true because the same issue that the defense has raised here today, that knowledge question, would still be the same issue that we would be discussing today had we charged a stolen property charge in this case. We would still be asking whether there was sufficient evidence to show that this defendant had obtained stolen and fraudulently obtained phones. Now, aside from the defendant's testimony, which in addition to being disbelieved by the jury based on the conviction, the defendant was impeached several times during his testimony as well. But aside from that, there was substantial circumstantial evidence of actual knowledge by this defendant. And when I use the phrase actual knowledge, I'm drawing a distinction between actual knowledge and deliberate ignorance. And in this case, the testimony came out that the defendant managed Ace Wholesale and was the primary contact for the individual from Michigan, Jason Floria. There were phone records and testimony that showed that Tirta Wijaya and co-conspirator Patel called the defendant when they had big shipments that were coming in. So there were phone records. That was Government Exhibit 557. And there was testimony from Now, caution. Let me ask you a question that has to do with knowledge about the fraud. Was there evidence that he knew that the people who were acquiring the phones from Sprint and AT&T and the rest made representations and had made some kind of representation to buy the phone to the company? Yes, Your Honor. They intend not to pay for it, is my understanding. Yes, Your Honor. And then they bring the phone in. Yes, Your Honor. So the people are... Other than those who may have stolen a phone out of a warehouse, those who went and bought the phones made representations and they were false, weren't they? Yes, Your Honor. There was testimony from both Hendi Tirta Wijaya and Trushar Patel, co-conspirators, and testimony from Jason Floria describing the manner in which individuals could obtain cell phones through two-year subscription contracts where they would be able to get a discounted or free telephone or cellular phone. They told him how to do it. Somebody did. People did learn how to do it, and I think the testimony at trial, at least Jason Floria's testimony, explained how when he initially began the scheme, he did tell people how to obtain multiple phones through entering into numerous family contracts, but then after a short period of time, he no longer had to tell people because it became contagious, is what he said, and people just knew that this was something that could be done in order to obtain cellular phones. And, Your Honor, I also think that there is also... There was evidence of Alfredo Capote having committed wire fraud in obtaining phones, not just through subscription schemes where people say they are going to enter into a contract and then...or they enter into a contract and then turn around and sell the phones that they obtained. With no intent of carrying it out. With no intent of carrying it out. Yes, Your Honor, with no intent to carry out that contract, and there was also testimony from the cellular providers on that matter. But there was another type of fraud that was being conducted as well, the Assyrian cell phone insurance fraud through which individuals would obtain a cell phone, get cell phone insurance for that phone, and then turn around and report the phone having been damaged by water damage. This is the scheme that Alfredo Capote and the defendant engaged in to obtain phones through insurance fraud. They were able to report the phone was damaged, and then a new phone gets shipped out. And there was testimony from the insurance company about how the new phone, when there's a damage report, the new phone gets shipped out before the old supposedly damaged phone has to be returned back to the insurance company. So in that instance, the individual is able to obtain two phones, and then they take both those phones and take them to Ace Wholesale or Westside Wireless. And in this case, the government showed that there were many, many phones that were taken to Westside Wireless by Alfredo Capote that were sourced by this Assyrian cell phone insurance fraud. Was that scheme charged separately? That was included, Your Honor, in the conspiracy count. Actually, it was in Count 16 and 17, the ones that were mailed on September 11th. Yes, Your Honor, that's correct. And those phones went and they were mailed straight to the Westside address, although before Westside opened, there's testimony that Defendant and Capote were planning to open. And that's where Westside did open, when it did open just a month later. Yes. The conspiracy count alleged them over at Acts 2 about how they got the phones, didn't it? Yes, Your Honor, it did. Say that again, I miss it. This conspiracy count had overt acts which described how they got the telephones. Yes, Your Honor, there were manner and means described. They weren't labeled as overt acts because overt acts are not required for a wide-fraud conspiracy under 1349. That's what I meant. It described how they got the phones. Yes, Your Honor, that was described in the conspiracy count. And there were counts both from mailing the phones based on the Assyrian fraud and also counts where the phone calls to Assyria and where lies were being told about the damage to the phones, those counts were also presented to the jury and the defendant was convicted on those counts as well. What about the trash pulls where they had the bags and receipts that showed that these phones were coming from the wireless carriers and just a few days before they were brought in, so they were obviously brand new. What does that show? Yes, Your Honor, there was evidence showing that in the trash at Ace Wholesale, there were receipts and contracts and retail bags from various stores such as Verizon or Apple, and those receipts and contracts indicated on them that the individual who had purchased the item that was once in that bag had entered into a contract in order to obtain cellular service. So there were these receipts, bags, and also contract documents that were sometimes in those bags that were all taken to Ace Wholesale and ended up in the trash. And significantly in connection with that, the government did multiple trash pulls, did an analysis of those trash pulls and showed that there was that close proximity of purchase of the phones and entering into the contract and then the phones ending up at Ace Wholesale, which goes back to the evidence that the individuals bringing the phones had no intent to honor the contracts that they were entering into. In response to seeing and hearing this testimony during the trial, the defendant's response was that first he said this is around page 157 in document 183, which is primarily the defendant's testimony. The defendant first said that if there were contracts and receipts, excuse me, that he did not see the contracts and receipts, and then later said if there were contracts and receipts, he disregarded them because they were, quote, just paperwork. So he waffled on whether he had seen those documents before, and there were many, many of those documents shown in the trash pulls. And also, Your Honor, on that note, there was a discussion in Jason Floria's testimony about after there was a, for some background, there was a search warrant that was conducted at Ace Wholesale, which was the initial store that was originally owned by Jason Floria. After Ace Wholesale was shut down due to that search warrant, Jason Floria testified that he and the defendant discussed how to continue the fraud that they did at Ace Wholesale while trying to protect themselves, and this is around document 181, pages 42 through 49, and 83 to 84. So they figure out that they've been shut down, and now they want to do it again, but they need to protect themselves, and this goes back to that idea that the defendant used the word continue, the terms continue the fraud. That, Your Honor, I don't have the transcript in front of me, and I don't think he specifically used those words. I do think he said that they were trying, while trying to protect themselves. I do think something along those lines was stated by Jason Floria. And as a follow-up to those questions, on page 47 of document 181, there were questions asked about what they did to try and protect themselves, and Jason Floria discussed how he had learned after the search warrant at Ace Wholesale that there were certain techniques that investigators were using in order to show that they were, that Jason Floria and Tony Archie were obtaining fraudulently obtained new phones, and Jason Floria said that things that they needed to do to avoid detection would be things like not leaving SIM cards on premises. So, that was something that happened at Ace Wholesale. Along with the contracts and receipts, there were SIM cards that were inside the phones that were being sold. Those SIM cards were just thrown in the trash, and they were found during trash pulls as well. So, Jason Floria said that they talked. What is the significance of that? The significance of the SIM cards, Your Honor, is that the SIM card is needed to provide cellular service on the phone. So, if the SIM card that was associated with a certain subscriber who had entered into a contract was simply tossed in the trash a couple days after the phone was purchased and obtained for cellular service, that is also evidence that the individual did not intend to honor the contract, and therefore would have fraudulently obtained that phone. And in addition to talking about SIM cards, Jason Floria discussed the need to limit bags, receipts, and stuff like that, is what he said. And so, those are the bags, the retail bags that are emblazoned with the logos of the stores that these new phones were being brought from, the receipts and other things associated like that, which would be contracts. So, Your Honor, there was a substantial amount of evidence in this case, and the briefing outlines additional pieces of evidence. There were also multiple conspirators that testified for the government. There was a substantial amount of records analysis that was conducted. The cellular providers testified and explained how these phones were obtained through fraud. And the records from Ace Wholesale and Westside Wireless themselves tied back to those phones that the cellular providers said were obtained through fraud. Thank you. Thank you, Your Honors. So, the government started out by talking about how Mr. Archie testified in this case. And I agree that he did testify in this case, and the government laid out in its response brief the things that he testified to. And I asserted in my reply brief that even if the court believes the exact opposite of the testimony that he provided, I still don't think you have sufficient evidence to show that he intended to join this specific conspiracy as outlined in the indictment. And that's the choice that the government made here when they chose to charge it this way. You agree that a lot of the phones were obtained by fraud? I agree that Sprint and AT&T testified that they thought... Well, I mean, people signed contracts with no intent to carry them out. In other words, fraudulently induced the supplier to enter into the agreement. I think that presumes that there's someone there saying, go in and do that. I think everyone in the case agreed that that does happen. Well, it happened a lot. So, the question becomes whether he had knowledge of that, of how they were acquired. Right, Your Honor. And I think the court asked the government whether there were specific instances in this case of actual fraud that could be tied back. And I don't think there were cases where they came in and said, okay, Mr. Jones went in on February 1st and he broke his contract and here's the phone that came from Mr. Jones. And then Mr. Patel says, yes, I told Mr. Jones to do that. There was no evidence like that in this case. There was evidence that there's a general credit mulling scheme that can occur and that everybody knows how it works. You go in and you get the phones and then you break your contract. And that some of those phones ended up at Ace Wholesale or Westside Wireless. But I don't think that then can be extrapolated to say, well, Mr. Archie must have wanted to carry out that scheme. I mean, I think that's. What did he say he understood when he received or was told about bulk deliveries of phones? Well, he talked about people getting replacement phones or upgraded phones. So, carriers would often give incentives. So, if I have my 2-year-old cell phone, they would say, come and get your new cell phone from Sprint. We're going to give it to you for $200 if you re-up with us. So, he testified that his understanding is someone would go in, re-up and get the new phone, decide to keep their old phone and sell their new phone. I know, but Judge Choflin alluded to this earlier. If you had individuals coming in one by one and doing that, then maybe there isn't any inference at all to draw that the recipient of the phone, Mr. Archie in this case, knows anything of what happened behind the scenes. But he was receiving, he and the company were receiving, as I understand the briefs, and I haven't gone into the records, so I can't verify it yet. They were receiving bulk purchases, bulk sales, right? How many at a time? Sometimes 10, sometimes 20, Your Honor. And the co-defendants testified. How does one person come up with 20 phones? Well, the co-defendants testified that I would buy the phones off Craigslist. So, someone would list, I have a phone for sale. I'd go meet that person at McDonald's and I'd buy their phone. Then I would collect all the phones that I bought from people at McDonald's or at my own store. The co-defendants had their own store where they were buying these cell phones. So, people would either break their contract or do whatever, bring the phone in to Mr. Patel or Hindi. He would collect the phones that he paid for, and he would bring those phones to Mr. Archie's store or Westside Wireless and sell the phones there in bulk. If those, did Mr. Archie, was Mr. Archie asked about whether he thought anything was unusual, given that some of the phones that were purchased in bulk were new? I mean, people don't usually, it seems to me, sell new phones on Craigslist. If they do what you suggested, they'll sell the old phone, not the new phone. Right. I understand. What he testified to was he saw, at the time that this was occurring, he saw advertisements on TV and other places of other businesses doing this. So, TV advertisements of a place called Gisdell saying, we buy your phones. And so, his assumption was everybody's doing the same thing. We're all buying these phones and people are bringing them in. And I think even if the court believes the opposite of what he testified, everything that the government has said, I don't see how that shows that he had the intent to defraud the characters. Yes, he may have had the intent to buy stolen property or traffic in stolen or fraudulent property, but the court, the government is asking the court to make a big stretch here. In the cases that it has cited, the intent that is at issue when you say, oh, they're repeated sales, so he must have intended this, the intent that is at issue is the same intent. The intent to possess the stolen property. The real criminals of the case, I suppose, are the people who went to Sprint and AT&T and bought these phones with no intent of carrying out the contract, put no money down, probably, and then went in and sold the phones. At least in this case, Your Honor, those are the people who are guilty of the fraud. Those are the ones that should have been prosecuted. Well, they're certainly guilty of the fraud that the government alleged, right? If the government is alleging a specific scheme to defraud AT&T and someone goes and does that, yeah, those people should be prosecuted for that, but that's not what's charged here. It seems to me that your client knew about this or the jury could reasonably find that your client knew about this from the SIM cards being disposed of at his place and with the presence of all of those broken contracts that he, the jury could find, knew about. Okay, Your Honor, and I think that's where we get into the issue of did he have actual knowledge or was he deliberately indifferent to this? The co-defendants who testified never said, and they testified explicitly, we did not tell him this. He did not ask us about the stolen phones. He did not ask us about fraudulent phones. So I understand that we can make some presumptions if a defendant testifies, but I'm going to ask the court how far we can carry that out. Does it mean that the government no longer has any burden on any issue that we might raise on appeal if a person testifies? It just can't be that way. I think we understand your case, and the red light's on. Thank you, Your Honor. Hines v. Nazaire.